# XUSPO SENTENCING CONSULTANTS
## MITIGATION & INVESTIGATIONS

**Comprehensive Sentencing Mitigation Report**
for
Kamanye Williams
Dkt. No.: 24-cr-00096-JMC-2

According to the provisions of 18 U.S.C. § 3553, the Court shall impose a sentence that is sufficient, but not greater than necessary, to comply with statutory purposes of sentencing, and in determining such sentence, the Court shall consider, *inter alia*, (1) the nature and circumstances of the offense, and the history and characteristics of Kamanye Williams, and (2) the need for the sentence imposed, as set forth in 18 U.S.C. § 3553(a)(2).

In consideration of the sentence that must be imposed in this case, Kamanye Williams respectfully requests that the Court consider the following information in mitigation of his sentence:

## Sources of Information

- Interviews with Kamanye Williams (client)
- Interviews with Alfred Guillaume, III (attorney)
- Interview with Kelli Harvin (mother)
- Interview with Gabrielle Artis (1st cousin)
- Plea Agreement and other case materials for the instant offense
- Presentence Investigation Report dated May 8, 2025
- PACER docket entries for 24-cr-00096-JMC, USA v. Robinson et al

## *Current Posture of* **Kamanye Williams**

On March 11, 2025, Kamanye Williams appeared in the U.S. District Court for the District of Columbia, and pled guilty to a Fifteen-Count Criminal Information charging him with Count 1: Conspiracy to Interfere with Interstate Commerce, in



10901 Rhode Island Ave.
Suite 344
Beltsville, MD 20704

PHONE   240-583-1864
FAX   301-567-5727
EMAIL   turner@xuspo.com
WEBSITE   www.xuspo.com

violation of 18 USC § 1951(a); Count 3: Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 USC §§ 924(c)(1)(A)(i) and 2; and Count 13: Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 USC §§ 924(c)(1)(A)(i) and 2.

Mr. Williams was arrested on February 18, 2024, and has been continuously detained since that date. The client has not been engaged in any conduct that would jeopardize his acceptance of responsibility in this case.

## Offense Conduct

According to the Presentence Investigation Report prepared in this case, Mr. Williams conspired with Michael Robinson, Gianni Robinson, London Teeter, and others to rob the Chinatown Walgreens Pharmacy on seven separate occasions from on or about July 1, 2023, until on or about February 12, 2024.

Michael Robinson and London Teeter used their positions as managers of the Chinatown Walgreens to provide information through telephone calls or text messages on how to access the Manager's Office, an employee-only area, how many armed security guards were present, when the daily cash proceeds from the business would be transferred to the Manager's Office, and how much cash was located in the Manager's Office at any given time. Michael Robinson and London Teeter would relay this information to Gianni Robinson, who would then pass it on to Kamanye Williams so that he could more easily rob the Chinatown Walgreens. Throughout the conspiracy, Mr. Williams and his co-conspirators surveilled the Chinatown Walgreens to determine the best time to rob it.

After the Chinatown Walgreens had been robbed on three occasions, Special Police Officers (SPOs) were hired to protect the business. Mr. Williams was aware of the SPOs and robbed them of firearms during the robberies that occurred on December 4, 2023, and February 11, 2024.

During the robbery of the Chinatown Walgreens on February 11, 2024, Mr. Williams brandished a firearm towards a SPO and threatened to kill him. Kamanye Williams then forced Michael Robinson and the SPO into the Manager's Office and closed the door. Mr. Williams proceeded to rob the SPO of his firearm and stole cash from the Manager's Office. As Mr. Williams opened the door to leave, a second armed SPO fired a round and struck Kamanye Williams in the chest. Mr. Williams was then arrested.

## Codefendants/Related Cases

Michael Robinson, Dkt. No.: 24-cr-00096-JMC-1: On March 11, 2025, Michael Robinson pled guilty to Counts 1 and 7 of the Fifteen-Count Criminal Indictment. On July 23, 2025, Michael Robinson was sentenced to 87 months for Count 1 and a consecutive sentence of 60 months for Count 7 for a total sentence of 147 months imprisonment.

Gianni Robinson, Dkt. No.: 24-cr-00096-JMC-3: On February 28, 2025, Gianni Robinson pled guilty to Counts 1 and Five of the Fifteen-Count Criminal Indictment. Sentencing is scheduled to be held on October 10, 2025.

London Teeter, Dkt. No.: 24-cr-00096-JMC-4: On February 13, 2025, London Teeter pled guilty to Count 1 of the Fifteen-Count Criminal Indictment. Sentencing is scheduled to be held on October 10, 2025.

## Statutory Penalties

Count 1: Conspiracy to Interfere with Interstate Commerce (18 USC § 1951(a)) – the maximum term of imprisonment is 20 years, not more than 3 years supervised release, and a fine of $250,000, pursuant to 18 U.S.C. §1951(a).

Count 3: Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence (18 USC §§ 924(c)(1)(A)(i) and 2) – the minimum term of imprisonment is 5 years to a maximum term of life imprisonment, not more than 5 years supervised release, and a fine of $250,000, pursuant to 18 USC § 924(c)(1)(A)(i).

Count 13: Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence (18 USC §§ 924(c)(1)(A)(i) and 2) – the minimum term of imprisonment is 5 years to a maximum term of life imprisonment, not more than 5 years supervised release, and a fine of $250,000, pursuant to 18 USC § 924(c)(1)(A)(i).

## Impact of the Plea Agreement

Mr. Williams agreed to plead guilty to Count 1: Conspiracy to Interfere with Interstate Commerce, in violation of 18 USC § 1951(a); Count 3: Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 USC §§ 924(c)(1)(A)(i) and 2; and Count 13: Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 USC §§ 924(c)(1)(A)(i) and 2. The remaining counts pending against him will be dismissed at sentencing.

The Government and Mr. Williams agree and stipulate that the Estimated Offense Level will be at least 34.

The parties agree and stipulate that Mr. Williams's Estimated Criminal History Category is I.
The parties agree and stipulate that Mr. Williams is not eligible for an adjustment pursuant to USSG §4C1.1 because he has criminal history points and he used violence or credible threats of violence in connection with the offense; the offense resulted in death or serious bodily injury to Mr. Williams; and he possessed, received, purchased, transported, transferred, sold, or otherwise disposed of a firearm or other dangerous weapon during the course of this conspiracy.

Based upon an Estimated Offense Level of 34 and an Estimated Criminal History Category of I, the parties agree and stipulate the Sentencing Guidelines Range is 151-188 months for Count 1, 60 months consecutive for Count 3, and an additional 60 months consecutive for Count 13. This results in an Estimated Guidelines Range of 271-308 months.

The parties agree that, solely for the purposes of calculating the applicable range under the Sentencing Guidelines, neither a downward nor upward departure from the Estimated Guidelines Range is warranted. Should the Court or the Probation Office determine that a guidelines range different from the Estimated Guidelines Range is applicable, that will not be a basis for withdrawal or recission of the plea agreement by either party.

The parties agree that a sentence within the Estimated Guidelines Range would constitute a reasonable sentence in light of all of the factors set forth in 18 U.S.C. § 3553(a). However, Mr. Williams reserves the right to seek a sentence below the Estimated Guidelines Range based upon factors to be considered in imposing a sentence, pursuant to 18 U.S.C. § 3553(a).

Mr. Williams does not object to the Government's recommendation that he continue to be detained pending sentencing in this matter.

Mr. Williams agrees to pay restitution and forfeit his rights to any firearms and ammunition involved in or used in the knowing commission of the offense.

Mr. Williams understands he will be admitted into the Witness Security Program while in prison and after the completion of his sentence only if he meets the strict eligibility requirements and that determination as to whether he has met those requirements lies within the sole discretion of the United States Department of Justice.

4

*Guideline Calculations*

Pursuant to USSG §1B1.2(d) and §1B1.2, comment (n.3), a conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.

In this case, Mr. Williams pled to Conspiracy to Interfere with Interstate Commerce by Robbery, which involved seven separate robberies of Chinatown Walgreens –July 18, 2023 (Count 1/Overt Act 1), August 2, 2023 (Count 1/Overt Act 2), September 2, 2023 (Count 1/Overt Act 3), November 10, 2023 (Count 1/Overt Act 4), December 4, 2023 (Count 1/Overt Act 5), January 9, 2024 (Count 1/Overt Act 6) and February 11, 2024 (Count 1/Overt Act 7). Each of the robberies involved a separate harm and cannot be grouped together for guideline calculation purposes.

For an offense in violation of 18 U.S.C. § 1951(a), the applicable sentencing guideline is found in USSG § 2B3.1 – *Robbery*.

For an offense in violation of 18 U.S.C. § 924(c)(1)(A)(i), the applicable sentencing guideline is found in USSG § 2K2.4 – *Use of Firearm, Armor-Piercing Ammunition, or Explosive During or in Relation to Certain Crimes*.

The overt counts in Count 1 do not group together, pursuant to USSG §3D1.2. Counts 3 and 13 are excluded from being grouped, pursuant to USSG §3D1.1(b)(1). For Counts 3 and 13, the guideline sentence is the minimum term of imprisonment (60 months) required by statute. Chapters 3 and 4 shall not apply to this count of conviction, pursuant to USSG §2K2.4(b).

## Group 1 (Overt Act 1 on July 18, 2023)

*Base Offense Level:* 20, pursuant to USSG §2B3.1(a).                              **20**

*Specific Offense Characteristics:* None.                                          **0**

*Victim-Related Adjustments*: None.                                                **0**

*Adjustment for Role in the Offense:* None.                                        **0**

*Adjustment for Obstruction of Justice:* None.                                     **0**

*Adjusted Offense Level*:                                                          **20**

### Group 2 (Overt Act 2 on August 2, 2023)

*Base Offense Level:* 20, pursuant to USSG §2B3.1(a).                **20**

*Specific Offense Characteristics:* During the commission of the robbery, Mr. Williams brandished a firearm. If a firearm was brandished or possessed, the offense level is increased by 5, pursuant to USSG §2B3.1(b)(2)(C).                **+5**

*Victim-Related Adjustments*: None.                **0**

*Adjustment for Role in the Offense:* None.                **0**

*Adjustment for Obstruction of Justice:* None.                **0**

*Adjusted Offense Level:*                **25**

### Group 3 (Overt Act 3 on September 2, 2023)

*Base Offense Level:* 20, pursuant to USSG §2B3.1(a).                **20**

*Specific Offense Characteristics:* During the commission of the robbery, Mr. Williams brandished a firearm. If a firearm was brandished or possessed, the offense level is increased by 5, pursuant to USSG §2B3.1(b)(2)(C).                **+5**

*Victim-Related Adjustments*: None.                **0**

*Adjustment for Role in the Offense:* None.                **0**

*Adjustment for Obstruction of Justice:* None.                **0**

*Adjusted Offense Level:*                **25**

### Group 4 (Overt Act 4 on November 10, 2023)

*Base Offense Level:* 20, pursuant to USSG §2B3.1(a).                **20**

*Specific Offense Characteristics:* During the commission of the robbery, Mr. Williams pointed a silver handgun with a black tip at the Chinatown Walgreens employee who was counting cash in the Manager's Office. If a firearm was otherwise used, the offense level is increased by 6, pursuant to USSG §2B3.1(b)(2)(B).                **+6**

*Victim-Related Adjustments*: None.                **0**

*Adjustment for Role in the Offense:* None.                                    **0**

*Adjustment for Obstruction of Justice:* None.                          **0**

*Adjusted Offense Level*:                                                          **26**

## Group 5 (Overt Act 5 on December 4, 2023)

*Base Offense Level:* 20, pursuant to USSG §2B3.1(a).          **20**

*Specific Offense Characteristics:* During the commission of the robbery, Mr. Williams brandished his firearm and took possession of a firearm belonging to a security guard. If a firearm was brandished or possessed, the offense level is increased by 5, pursuant to USSG §2B3.1(b)(2)(C).          **+5**

*Specific Offense Characteristics:* During the commission of the robbery, Mr. Williams took a firearm belonging to a security guard. If a firearm, destructive device, or controlled substance was taken, or if the taking of such item was an object of the offense, the offense level is increased by 1, pursuant to USSG §2B3.1(b)(6)          **+1**

*Victim-Related Adjustments*: None.                                          **0**

*Adjustment for Role in the Offense:* None.                                    **0**

*Adjustment for Obstruction of Justice:* None.                          **0**

*Adjusted Offense Level*:                                                          **26**

## Group 6 (Overt Act 6 on January 9, 2024)

*Base Offense Level:* 20, pursuant to USSG §2B3.1(a).          **20**

*Specific Offense Characteristics:* During the commission of the robbery, Mr. Williams held the Chinatown Walgreens employees at gunpoint and demanded money. If a firearm was otherwise used, the offense level is increased by 6, pursuant to USSG §2B3.1(b)(2)(B).          **+6**

*Victim-Related Adjustments*: None.                                          **0**

*Adjustment for Role in the Offense:* None.                                    **0**

*Adjustment for Obstruction of Justice:* None.                          **0**

*Adjusted Offense Level:*                                                                 **26**

### Group 7 (Overt Act 7 on February 11, 2024)

*Base Offense Level:* 20, pursuant to USSG §2B3.1(a).                                      **20**

*Specific Offense Characteristics:*  During the commission of the robbery, Mr. Williams took a firearm belonging to a security guard. If a firearm, destructive device, or controlled substance was taken, or if the taking of such item was an object of the offense, the offense level is increased by 1, pursuant to USSG §2B3.1(b)(6)                                                                 **+1**

*Victim-Related Adjustments:* None.                                                       **0**

*Adjustment for Role in the Offense:* None.                                               **0**

*Adjustment for Obstruction of Justice:* None.                                            **0**

*Adjusted Offense Level:*                                                                 **21**

## MULTIPLE COUNT ADJUSTMENT

| Group   | Adjusted Offense Level | Units |
|---------|------------------------|-------|
| Group 1 | 20                     | ½     |
| Group 2 | 25                     | 1     |
| Group 3 | 25                     | 1     |
| Group 4 | 26                     | 1     |
| Group 5 | 26                     | 1     |
| Group 6 | 26                     | 1     |
| Group 7 | 21                     | ½     |

Total Number of Units: 6
Greater of the Adjusted Offense Levels Above: 26
Increase in the Offense Level (USSG §3D1.4): +5
Combined Adjusted Offense Level: 31                                                       **31**

*Chapter 4 Adjustments:* None.                                                            **0**

*Adjustment for Acceptance of Responsibility:* Mr. Williams fully accepted responsibility for his actions in a timely manner and admitted to all relevant conduct. Therefore, he is entitled to a 3-level reduction to the offense level, pursuant to USSG §3E1.1(a) & (b).                                                        **-3**

*Total Offense Level:*                                                                    **28**

## Criminal History

The United States Probation & Pretrial Services Office completed a Presentence Investigation Report and determined Mr. Williams had one prior adult conviction that resulted in a total of one (1) criminal history point and a criminal history score of one (1). A criminal history score of one (1) establishes a Criminal History Category of I.

We thoroughly reviewed the Presentence Investigation Report and did not find any calculation errors that would negatively impact the client's criminal history score or Criminal History Category.

Based on a Total Offense Level of 28 and a Criminal History Category of I, the advisory sentencing guidelines range is 78-97 months imprisonment for Count 1.

## Applying the Factors of 18 U.S.C. § 3553(a) to **Kamanye Williams**

### Kamanye Williams*'s History and Characteristics*

The following information regarding Kamanye Williams's history and characteristics is offered as a supplement to the presentence investigation report conducted by the U.S. Probation and Pretrial Services Office.



Kamanye Lawrence Williams

Kamanye Lawrence Williams was born on June 10, 1999, in Washington, DC. According to Kamanye, he is the younger of two sons born from a relationship between Charles Earl Williams and Kelli Harvin.

Mr. Williams's father, Charles Earl Williams, passed away in 2014 from complications following a stroke. His mother, Kelli Harvin, continues to reside in the family home in Lanham, Maryland. Ms. Harvin recalls first meeting Charles in 1995 as she was walking through Union Station in Washington, D.C., when he approached her and struck up a friendly conversation. Their connection quickly grew into a romantic relationship, and in time, they welcomed two sons together, including Kamanye. Ms. Harvin shared that she, Charles, and their two sons lived together as a family until she and Charles separated, when Kamanye was only about a year old.

 

Kamanye's parents, Charles Earl Williams, Sr. and Kellie Harvin

Ms. Harvin stated that for a couple of years after their breakup, the boys' father was an active parent in their lives. However, Charles suffered from depression after losing his job and was unable to bounce back and find other employment. Over the years, his involvement and interaction with his sons decreased and almost completely stopped once he became addicted to drugs when Kamanye was approximately 9 years old. Reportedly, Charles Williams stopped coming around because he did not want his sons to see how drug addiction had negatively impacted his physical appearance. According to Kamanye, he only recalls seeing his father three times in his life before his death. For several years, Kamanye had resentment and anger towards his father for not being in his life.

When Kamanye was approximately 15-16 years old, his father had overcome his drug addiction and rekindled his relationship with Kamanye. Unfortunately, his father died approximately one month later. Ms. Harvin explained that Kamanye was deeply affected by his father's passing, as the two had rebuilt their bond and were in frequent, almost daily, contact by telephone before his death.

According to Kamanye, his mother was present in his life during his childhood, but he was primarily raised by his maternal grandparents, Warren and Mariam Evans.



Kamanye (infant in blue shirt) with his mother, brother, grandparents, aunt, uncle, and 1st cousins

Kamanye described his mother's relationship with his grandmother as being toxic and dysfunctional. He remembers feeling like he was a referee because he was always trying to calm them down and settle their arguments, even when he was a young boy.

Sadly, both of Mr. Williams's grandparents are now deceased. Reportedly, Warren Evans died two months after Kamanye's father had died. For several years, Mr. Williams has been his maternal grandmother's primary caretaker after she became ill from congestive heart failure. Mariam Evans died on June 14, 2025. Due to being detained for this instant offense, Kamanye was unable to attend his grandmother's funeral. Mr. Williams shared that he was exceptionally close to his grandmother, and he carries deep remorse knowing that his own actions prevented him from being by her side during the time she needed him most.

 

Mariam Evans with Kamanye (l) and his brother, Kaivon

From his father's prior relationship, Kamanye has three older half-siblings: Tiffany (46), Ebony (40), and Charles (36) Williams. His half-sisters reportedly live in District Heights, Maryland, while his half-brother resides somewhere in Virginia, though Kamanye is not certain of his exact location.

From his mother's relationship with Charles Earl Williams, Kamanye has an older brother, Kaivon Williams (age 27), who resides in Houston, Texas. Also, Kamanye has a younger, maternal half-sister, Kelis Harvin (age 18), who resides in Lanham, Maryland.

Mr. William's mother only has one sister, Jerri Artis, who has two daughters. When Kamanye was a child, his maternal grandmother would have all her grandchildren stay over at her house almost every weekend. As a result, Mr. Williams has a very close relationship with his first cousins, Gabrielle, Amanda, and Alonzo Artis.



Kamanye (2nd from the left) with his maternal siblings and 1st cousins at grandma's house



Kamanye (2nd from the right) with maternal siblings and 1st cousins at a movie premiere

Kamanye Williams stated he has never been married, and he does not have any children.

Mr. Williams reported that he has lived within the Washington, DC, metropolitan area his entire life. Since he was a young child, he has reportedly resided at his maternal grandparents' home located at 6300 Cheswold Place, Lanham, Maryland.

## Substance Abuse and Treatment

According to Kamanye, he occasionally consumes alcohol but has used and abused controlled substances since he was 10 years old. He initially began smoking marijuana. At the age of 14, he began drinking "lean" (cough syrup containing codeine and promethazine mixed with a soft drink) and taking prescription opioids. At the age of 16, he also began ingesting Adderall pills. Mr. Williams reported he was abusing all these controlled substances almost daily before his arrest in this case.

Reportedly, Mr. Williams never confided to anyone about his drug usage. The Presentence Investigation Report revealed that shortly after being arrested for this case, Kamanye was administered a drug test that tested positive for opioids on February 19, 2024. Mr. Williams stated he has never received any substance abuse treatment or counseling. However, he is interested in receiving drug treatment while in custody of the Bureau of Prisons.

Additionally, Kamanye reported that his mother and maternal grandmother struggled with alcoholism, and his father was a former heroin addict who had gotten clean shortly before his death.

## Mental Heath

Although Mr. Williams had never received professional counseling or mental health treatment before his arrest in this case, he reported that he has been diagnosed with post-traumatic stress disorder (PTSD). He attributes this condition to the cumulative trauma of losing multiple loved ones over the years, including his father, grandfather, grandmother, and other close relatives and friends. In August of 2023, Kamanye's best friend, Teyon Harrod was murdered in District Heights, Maryland.



News report of Teyon Harrod's murder

Mr. Williams reported to the probation officer that he attempted to commit suicide after learning about the death of his best friend by taking approximately 10-11 Percocet pills at once. Thankfully, his attempt to end his life was unsuccessful. Kamanye stated he has never tried to take his own life since that one attempt.

Kamanye's mother reported that she and his father suffered from mental illness.

<u>Employment</u>

Due to his grandmother's declining health, Kamanye was appointed by his family to be her primary caretaker in or about July 2023. So, he quit his job as a cashier and stocker at a local grocery store and began taking care of his grandmother.

Mr. Williams reported prior employment as a warehouse associate for Home Depot, a stocker for another grocery store, and as a concierge at Baltimore-Washington International Airport.

<u>Education</u>

Mr. Williams stated he can read, write, and speak English fluently. He does not speak any other languages. Kamanye reported he graduated from Dunbar High School in Washington, DC, in 2018. Mr. Williams has not attended any other educational or vocational institution since graduating from high school.



Kamanye's high school graduation in 2018

<u>Community Support</u>

As indicated by the letters of support written by his brother and maternal aunt, Kamanye has strong community ties and individuals in his life who are willing to help him transition back into society.

## The Nature and Circumstances of the Offense

There are at least three factors in mitigation of the nature and circumstances of the offense that may be pertinent to the provisions of USSG §1B1.4 - *Information to Be Used in Imposing Sentence (Selecting a Point within the Guideline Range or Departing from the Guidelines)*. Although these considerations do not challenge the propriety of the guilty plea and finding of guilt by the Court, they are relevant to the nature and circumstances of the offense.

According to Mr. Williams's mother, Kelli Harvin, she has faced lifelong struggles with mental health challenges and often made unwise choices in relationships, compounded by a certain naivety about the realities of the world. Life was difficult for her, and despite her love for her three children, she often felt overwhelmed and unable to be the mother they needed. Financial hardship was a constant burden, and there were periods of such instability that she and her children experienced homelessness, at times sleeping in her car. Eventually, Ms. Harvin's mother and stepfather stepped in to provide her children with the stable home she could not, while Ms. Harvin remained on the outside, deeply aware of her own shortcomings and grateful that her children were given the security she could not provide.

This early exposure to instability, homelessness, and emotional hardship shaped Kamanye's development, leaving him without the consistent guidance, security, and structure that every child needs. While Mr. Williams takes full responsibility for his actions as an adult, it is essential to recognize the role that childhood trauma and housing insecurity played in shaping the person he became. This background is not an excuse, but it is a critical piece of context—one that supports a sentence focused on accountability, healing, and the opportunity for meaningful rehabilitation.

Secondly, Kamanye sustained gunshot wounds during the February 2024 robbery, requiring emergency surgery for a liver laceration, stomach and pancreatic injuries, and a bisected left kidney at MedStar Washington Hospital Center. He lives with chronic pain, a large abdominal scar, and has previously endured splenectomy, partial pancreatectomy, and kidney removal from earlier gunshot injuries.

These injuries already impose a severe physical and emotional burden, making incarceration inherently more punitive for him than for most defendants, and they weigh in favor of a sentence of imprisonment of 198 months or less. Lastly, Kamanye Williams became involved in this conspiracy when he was approximately 23 years old. It is widely known and accepted that a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults. These qualities often result in impetuous and ill-considered actions and decisions, and offer an explanation as to why Kamanye would get involved in this conspiracy. Thus, we believe Mr. Williams's youthfulness is a mitigating factor the Court could consider to impose a sentence of imprisonment of 198 months or less.

### *The Need for the Sentence Imposed to reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense*

Mr. Williams's offense is undoubtedly serious and warrants a meaningful term of incarceration. However, a sentence of 198 months or less is substantial by any measure and reflects both the gravity of the offense and the need for accountability. Such a sentence communicates to the public that violations of this nature carry severe consequences and reaffirms the law's integrity, particularly when it comes to offenses involving robbery and the use of firearms during such robberies.

Moreover, this sentence avoids crossing into the territory of excessively punitive outcomes that risk undermining respect for the law by appearing disproportionately harsh, particularly in light of Mr. Williams's individual background. He has very little prior criminal history, accepted responsibility for his actions, and endured a deeply traumatic and unstable childhood. These are mitigating factors that the Court can and should consider under 18 U.S.C. § 3553(a). A sentence not greater than 198 months imprisonment or less would recognize his potential for rehabilitation while still condemning the offense with the seriousness it deserves.

Additionally, imposing a term of 198 months or less would allow the Court to distinguish Mr. Williams's case from the most egregious and violent offenders, ensuring proportionality in sentencing. It would provide firm but measured punishment and leave open a meaningful opportunity for Mr. Williams to reenter society later in life with the possibility of contributing positively.

In conclusion, a sentence of 198 months or less would reflect the seriousness of the offense, promote respect for the law, and provide just punishment while aligning with the broader purposes of fairness and rehabilitation envisioned by § 3553(a).

## *The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct*

In today's world, information spreads instantly. News of arrests, convictions, and lengthy prison terms reaches not only the general public but also those contemplating similar crimes. The case of Mr. Williams and his co-defendants sends a clear message: engaging in robbery conspiracies carries a serious risk of spending many years behind bars.



A local online news article that is following the court proceedings in Mr. Williams's case.

A sentence of 198 months or less would adequately serve the purpose of deterring both Mr. Williams and the broader public from engaging in similar criminal conduct, as required by 18 U.S.C. § 3553(a)(2)(B). First, general deterrence does not require the harshest possible sentence to be effective; rather, it relies on the certainty and clarity of punishment, not merely its severity. A sentence of 198 months or less is a substantial deprivation of liberty. It sends a powerful message that offenses of this nature will be met with long-term incarceration and serious consequences.

Research consistently shows that longer sentences have diminishing marginal returns on deterrence. Once a sentence reaches a certain threshold, particularly beyond 15 years, the deterrent effect does not proportionally increase. In fact, excessively long sentences may undermine public confidence in the justice system by appearing overly punitive or disconnected from rehabilitation.

18

Specific deterrence is also fully satisfied in Mr. Williams's case with a sentence of 198 months or less. This is Mr. Williams's second criminal conviction. He has accepted responsibility and demonstrated a willingness to change. Nothing in his history suggests he is likely to reoffend, especially after serving a substantial prison term followed by a significant period of supervised release. A term of 198 months or less ensures Kamanye has ample time for reflection, correction, and engagement in rehabilitative programming, while also making clear the consequences of any future misconduct.

Thus, a sentence of 198 months or less strikes the proper balance: it is severe enough to deter future criminal conduct—both by Mr. Williams and by others—while avoiding unnecessary harshness that could undercut the legitimacy and purpose of the sentencing system.

### The Need for the Sentence Imposed to Protect from Further Crimes by Kamanye Williams

A sentence of imprisonment of 198 months or less ensures that Mr. Williams is incapacitated during the peak years of potential criminal activity. Most individuals involved in robbery-related offenses tend to recidivate within the first few years post-release, especially if released at a young age. A sentence of 198 months or less ensures that Mr. Williams will be significantly older—well into his late 30s or early 40s—upon his release.

The 2022 U.S. Sentencing Commission Recidivism Study revealed that offenders over age 40 have a markedly reduced risk of recidivism compared to those released in their 20s or 30s. Age alone is one of the strongest predictors of desistance from crime.

Therefore, a sentence of imprisonment of 198 months or less significantly mitigates future risk to the public, simply by removing Mr. Williams from the community during his highest-risk years.

### To Provide Kamanye Williams with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

A sentence of 198 months or less strikes an appropriate balance between accountability and the opportunity for meaningful rehabilitation.

Within this timeframe, Mr. Williams would have sufficient access to the full range of educational, vocational, and therapeutic programs offered by the Bureau of Prisons — including college coursework, vocational certifications (e.g., building trades, culinary arts, or computer technology), and cognitive behavioral therapy.

Notably, the BOP prioritizes program placement and completion for inmates nearing release, meaning excessively long sentences often delay or reduce the effectiveness of such programs due to a lack of urgency or eligibility. A sentence of 198 months keeps Mr. Williams within an optimal period for targeted programming and post-release planning, ensuring he not only participates in rehabilitation services but is also positioned to apply them upon reentry.

Furthermore, if Mr. Williams has any medical, psychological, or substance use treatment needs, a sentence of this length affords the BOP sufficient time to deliver care, but not so long as to risk institutionalization or undermine reintegration potential.

### *The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct*

One of the most difficult and relevant factors this Court must consider is the need to avoid unwarranted sentencing disparities.

Based on a Total Offense Level of 28 and a Criminal History Category of I, the advisory sentencing guidelines range is 78-97 months imprisonment for Count 1. Due to Mr. Williams pleading guilty to two 18 U.S.C. § 924(c) offenses (Counts 3 & 13), he is subject to a mandatory minimum term of 10 years that must run consecutively to the sentence imposed for Count 1.

According to the United States Sentencing Commission's QuickFacts statistics for Fiscal Year 2024, the average sentence for defendants for robbery without a conviction for an 18 U.S.C. § 924(c) offense was 76 months imprisonment. For those defendants convicted of robbery and an 18 U.S.C. § 924(c) offense, the average sentence was 162 months imprisonment. Thus, a sentence of 198 months or less still places Mr. Williams within the upper echelon of sentences for serious and planned robbery offenses. The imposition of a higher sentence would cause an unwarranted sentencing disparity between Kamanye and other similarly situated defendants.

### *The Need to Provide Restitution to the Victim*

As a result of Mr. Williams's offense conduct, the Chinatown Walgreens is owed at least $28,983.00 in restitution.

Inmates earn very limited wages in prison, typically ranging from $0.12 to $0.40 per hour in the United States Bureau of Prisons' work programs. As a result, repayment during incarceration is nominal and does little to meaningfully reduce restitution owed. Additionally, data from the U.S. Department of Justice reveals

that offenders who serve lengthy sentences beyond 15–20 years face steep reentry barriers, limited employment prospects, poor financial stability, and higher rates of homelessness and relapse into poverty - all of which impair their ability to pay restitution.

By contrast, a firm yet measured sentence paired with rehabilitative support offers the greatest likelihood that restitution will ultimately be paid. In Mr. Williams's case, a sentence of 198 months or less is substantial and fully reflects the seriousness of his offense. At the same time, it better serves the victim's long-term interest in receiving meaningful restitution than a longer sentence, which would only delay Mr. Williams's reentry into the workforce and his ability to make consistent payments.

## _Conclusion_

Mr. Williams stands before this Court for sentencing following his convictions for Count 1: Conspiracy to Interfere with Interstate Commerce, in violation of 18 USC § 1951(a); Count 3: Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 USC §§ 924(c)(1)(A)(i) and 2; and Count 13: Using, Carrying, Possessing, and Brandishing a Firearm During and in Relation to a Crime of Violence, in violation of 18 USC §§ 924(c)(1)(A)(i) and 2.

Kamanye accepts full responsibility for his actions and does not minimize the seriousness of his conduct. In consideration of the foregoing discussion and analysis, we believe there is ample evidence in mitigation to allow the Court to impose a sentence of 198 months imprisonment or less, which would:
1. Reflect the seriousness of the offense;
2. Promote respect for the law and provide just punishment;
3. Afford adequate deterrence to criminal conduct;
4. Protect the public from future crimes;
5. Provide Mr. Williams with needed medical care and rehabilitative opportunities;
6. Allow for realistic restitution to the victim; and
7. Avoid unwarranted sentencing disparities.

Mr. Williams respectfully requests that the Court utilize this information to satisfy its mission to impose a sentence that is sufficient, but not greater than necessary under the circumstances of this case.

The foregoing comprehensive sentencing mitigation report has been prepared on behalf of Kamanye Williams at the request of his Defense Counsel, Alfred Guillaume, III, and is submitted in support of sentencing on July 14, 2025,

before the Honorable Jia M. Cobb, United States District Judge for the United States District Court for the District of Columbia.

Respectfully submitted,

*Turner R. Mebane, Jr.*

Turner R. Mebane, Jr.
XUSPO Sentencing Consultants
Report completed: July 31, 2025

**From:** kaivon williams <kaivonwilliams@gmail.com>
**Date:** December 12, 2024 at 9:57:11 PM CST
**To:** Kelis <bland.kelli@me.com>
**Subject: Re: Buddha's Character Letter Final Version**

Dear Judge Cobb,

I am writing this letter as the blood brother of Kamanye Williams. I have grown up with Kamanye my entire life, up until I moved to Houston, Texas, for my current position as a Technical Support Specialist at a law firm. We have built an unbreakable brotherly bond as we were growing up, and still are to this day.

Since I was a teenager, I have had the pleasure of showing my brother the different ways of obtaining financial security throughout life, such as interning, becoming a government contractor, or having a summer job. I have always known that I wanted to provide for myself and my family as I grew older.

Growing up, we've been called twins numerous times, although I am two years older than he. People always thought we looked alike, but he and I both knew we were different. We both understood that he takes an interest more in jobs that require hand work, such as carpeting, electrical technician, or welding, whereas I was more into the corporate office settings for my day-to-day.

Kamanye's character is very telling. He is a caring, loving, dependable, funny, impartial, and I can keep going, but these are the main characteristics that come to mind when I think of my brother. He puts others before himself a lot of times, and it tends to catch up to him.

My brother is not the person that is being painted by others, such as the prosecution team. Although, there are times where there is room for him to grow, we all have the same empty space, as no one is perfect. The alleged situation that has caused him to be where he is now was due to his caring about others. Jail is a place for people to go for rehabilitation, and he has certainly been rehabilitated as he awaits in jail for what's next.

After leaving for Houston, Kamanye became the "man of the house". He had a lot of weight to carry on his shoulders, such as caring for my grandmother, making sure my sister makes it to school and work, and being there for my mom, who had battles of her own she was trying to win and won them. Out of all the things mentioned, the only thing Kamanye wanted was to make sure everyone was ok. When I say ok, I say it in terms of people being financially ok for the time being. Making sure bills were paid and up to date, groceries were in the fridge, etc.

Since having him away, it has been hard for my family. The household has been in disarray. Bills are being missed, groceries aren't bought frequently, my sister no longer works due to her having to watch my grandmother while my mother or aunt is at work. Having him home

will alleviate a lot of burdens on the family. The most important is that someone will be home with my grandmother 24/7. My family will not have to worry about who must take off to take her to the medical appointments, the store, etc. Having him home will be crucially beneficial to the household.

I ask that you take this and any other character letter written for Kamanye into consideration when deciding upon anything. We ask for your mercy and grace.

**Character Statement from Jerri Artis on Behalf of Kamanye Williams**
**The District Court of the District of Columbia.**

To the Honorable Judge Cobbs,

This statement of good character is submitted to you on behalf of Kamanye Williams, who will be appearing in your court Friday, December 13, 2024.

My name is Jerri Artis, and I am an Analyst for the Food and Drug Administration where I have worked for thirty plus years.

Kamanye, also affectionally known as Buddha is my maternal nephew. He comes from a very closeknit family and is the middle child of his mother's three children. His character embodies all things middle child – including his empathy for others, his sense of independence and surprisingly his peacemaker qualities.  Kamanye and I are very close and have been since the day he was born (June 10, 2002).  I have watched him grow into a mature and very caring young man who sometimes acts as protective father figure. We certainly miss his presence, and hope that you have a better understanding of his character demonstrated in this short letter.

Throughout Kamanye's years of growth and development I have observed on many occasions his sincere commitment to principles of decency, respect, love and kindness towards everyone with whom he has interacted.  These characteristics are even more demonstrated towards his loving grandmother - whom he had become the primary caretaker of since her health started to decline about three years ago, his mother - who struggled with the loss of many relatives including Kamanye's dad, me, and many others (including extended family and neighbors alike). He always presents himself as honorable in his relationships with his family and closest friends as well as outside family and members of the general public.

It is not at all loss on me the mistakes Kamanye has made. His choice to break the law is certainly deemed punishable and has had a profound effect on our entire family specifically his younger sister, and my mother (his grandmother), but I know he is remorseful, and I know he will make the appropriate amends if given the opportunity to do so.

Please accept my statement as an honest and truthful testimony of Kaymanye's great character.

Respectfully,
Jerri Artis
Jerri_Artis@yahoo.coms